Case please Perry. Case number 09-2164, Robert Egenberg v. The Retirement Board. Your opponent is? We really don't have much of a choice do we? Is bottom up there? Are we waiting for Mr. Kugler? No. You're Mr. Kugler, so we're waiting for Anthony. He's an associate. He's an associate. He was here just a minute ago, right? Yes. You think we scared him away? I think so. I don't think so. Here he is. I'm sorry. Gentlemen, would you both step up and identify yourselves for the record? David Kugler, K-U-G-L-E-R, for the Retirement Board. Good morning. Timothy Sprade from Anthony Perica and Associates on behalf of Mr. Robert Eigenbauer. As the appellant, sir, you have 15 minutes to address the court and you can save out from that 15 any portion you wish for a response, Mr. Kugler. I think you can safely assume that we've read your briefs. Mr. Honor, having appeared before the court before, I am aware that the court has read the briefs, is familiar with the case, and so I'm just going to address or highlight a few matters, if I might. What's the standard of review here? The standard of review is the first question I was going to answer. The standard of review is manifest weight. This is a fact-intensive case. Okay, it's the manifest weight of the board or the judge? Manifest weight of the board. I think the court has often said that in these reviews, it reviews the board's decision and not the circuit court decision. It does not involve mixed questions of law and fact. It does not involve a de novo hearing, questions of law. This is a manifest weight case. Now, in regard to this case, there is no dispute that Mr. Eigenbauer sustained numerous injuries while performing an active duty on April 22 of 06. When you say numerous injuries, in the record, what do we have? The knee, what else? Yes, he complained of both knees. He complained of his neck, his back, his shoulder. I think there was something about a heart problem at one time, but that was... And this was clearly an injury that occurred while he was on duty driving a SWAT car. There is no question about that, Your Honor. I think the board's brief order in that case so stated. In fact, it found that Mr. Eigenbauer was in the performance of an active duty. It also found that Mr. Eigenbauer's medical condition at the time the board heard the case made him disabled and unable to return to work as a Chicago Police Department officer. The only issue in this case is really were the injuries sustained in the April on-duty accident the cause of the disability or was there an intervening other event which caused the disability for which he was entitled to a benefit? The board in reviewing this case determined that the disability, not that he didn't have injuries after the auto accident, but that the disability arose out of an incident in February 7 of 07 when he had an incident in a bar fight. The description of that bar fight is in the record. It was under oath given by Mr. Eigenbauer at the time he testified or gave evidence in a separate matter. Now, what supports and what is in the record, I guess, is the question to support the finding of this board that he was entitled to an ordinary disability, that he was not entitled to a duty disability. And incidentally, your honors, if I might, the fact that we arrived at an ordinary benefit, the issue did not then come up as to whether this benefit, if it were duty, should have been 50 or 75 percent as covered in the Act 154. So we're dealing with an ordinary, in the board's view, an ordinary disability. What supported the board's decision in this case? Well, if you look at this case and you see what supported it, after the accident of April 06, MRIs, x-rays were taken of the shoulder. There was no acute injury found to the shoulder. There were problems with the knee. There were complaints of neck and back. The neck and back all produced in the initial, right after the accident, nothing other than, I say this lightly when I say nothing other than degenerative type of conditions, not disabling. The fact that he had two surgeries, one to the right leg, one to the left leg. Was that disabled? The answer is no. His own doctors testified, or they didn't testify actually, they wrote in their reports that those injuries were not disabling. So we're then down to the shoulder injury. This was a... Was he returned to work before the first of the two bar fights? Yes. All right. He was returned to work and then he was off of work after that. All right. What happened was, with regard to the shoulder injury, you can see from all of the reports in this case, that there were no acute findings prior, following the accident, the auto accident. What happened was, after the bar fight in February, some eight days later, there was an MRI taken of the shoulder, which for the first time then revealed this slab tear. Slab tear? Also a surgical procedure. And he later had a surgical procedure with regard to a fusion surgery. So the board was left with, what caused the disability? Not never finding that he wasn't injured when the auto accident happened, but what was the cause of the disability? And the record, I believe, supports that. Now, if I might, I want to address... There was disputed testimony about medical treatment after the bar fight, was there, that the board heard? There was no disputed testimony. I think what happened, Your Honor, I think what I was going to just address, and I think Your Honor sort of beat me to the punch there, is a little bit... Emergency medical treatment. There was a question about whether or not the officer went to the hospital for some emergency treatment on February 2nd before the bar fight, or on February 7th at the time of the bar fight. Okay. Now, there was some conversation about that in the record. And the record would reflect that at the time of the hearing, Mr. Parryka gave us, or offered to give to the board, a correspondence from a doctor indicating that there was an error, that it wasn't February 7th, the date of the bar fight, but it was February 2nd before the bar fight. I, in conversation with Mr. Parryka, said to him, why are we getting a letter from a different doctor explaining this? Why are we not getting the letter from the doctor who wrote it? Mr. Parryka nevertheless didn't answer that, but nevertheless, we accepted into the record whatever he presented to us. Now, this came up in the court proceeding. Because in the court proceeding, what happened was, Mr. Parryka took out the record, filed his initial brief, I responded, he then filed his reply brief, and for the first time in the reply brief, he attached this particular letter. Well, the board could have called that doctor, couldn't they? Yeah, we could have. I suppose we could have. I mean, it wasn't your burden, but you could have called him. That's correct. The board had the power to do that. They could subpoena anybody they want. Yes, we could. And as a matter of fact, if you recall, I made mention of a mine. I think the board was criticized for not asking questions to Dr. Sherman by Mr. Parryka in his brief, and I suppose I was criticized in general for not asking those questions. The problem with that is that Mr. Parryka elected not to call Dr. Sherman. My point was that you could have called him. We could have. He had the letter. We could have. He had the letter. But the issue in this case, Your Honor, and I might say this, and I think our order supports it, whether it was February 2nd or February 2nd or February 7th is not the crucial issue in this case. What's crucial in this case is what happened on February 7th was not some minor event as Mr. Eigenbauer first portrayed it to the board, but was a rather horrific event as he portrayed it to someone else under oath. And that is the key to this case, because all of the medical reports, the seriousness of the medical reports, the serious findings in the medical reports, all came after the bar fight. And so I believe the record is very clear in this case that there is evidence in this record to support the board's finding of an ordinary disability, and as such, the board should be affirmed. Any further questions? Thank you. You'll have an opportunity to respond after we've heard from Mr. Patryka. Your name again? Sure. Timothy Sprague. S-P-R-A-G-U-E. From Mr. Sprague. Yes. I'm sorry. That's okay. Mr. Sprague, how do you respond to the traditional argument that the circuit court is reviewing the board's decision? That's without question.  And the circuit court is supposed to look at that for a manifest way to make a decision. Questions of fact are considered prima facie true and correct. Questions of law the court can not defer, doesn't have to defer to what an agency did. But here this was a factual question about what was the actual reason for the disability. And so what is your response to the cases that say that generally if there's some evidence to support the board's finding, some competent evidence to support the board's finding, that neither the circuit court nor we are permitted to change the landscape, so to speak? It is without question true. I don't deny that. We don't deny that for a minute, that the relevant standard is the manifest weight of the evidence. It is our contention that the record is overwhelmingly clear that the manifest weight, as Judge Riley noted, that the manifest weight of the evidence has not been met. The board's decision does, in fact, there is no prior fact that would find the evidence meets the decision of the board. Now, this matter really comes down to two issues. One of them has been kind of subsequently glossed over, which is fine, about the tendering of a document. Before we get into that, didn't the trial judge here make some credibility findings? Yes, he did. Does he have the right to make credibility findings? Well, again, what we received is he was basing it on the evidence that was presented to the board. And what we had was a doctor paid for by the board, Dr. Demarest, who admitted at the hearing that all of his opinions were based on pure speculation. He had never once treated Mr. Eigenbauer. In fact, what was also presented to the board were the voluminous medical records from Dr. Sherman, Dr. Anderson, Dr. Phillips, to name a few, stating that these injuries occurred after the incident. If I may, the bar fight is a critical point. Was there one bar fight? There was one on February 7th, which we firmly admit. But there is not one shred of evidence that Mr. Eigenbauer sustained any injuries from that bar fight. What about the MRI? There was an MRI conducted after that. And there had been the first, I thought, the first exams didn't reveal any kind of tears or of anything for the knee, the shoulder, the neck, after the initial car accident. He was hospitalized for three days. Yes. But there were examinations, and there weren't any bones broken. There weren't any tears. There was certainly not a slap tear. True? No. On October 4th, 2006, Dr. Sherman notes in his records, for the first time, Mr. Eigenbauer complains of left shoulder pain and low back pain. The emphasis had always been on the left knee. This is October 4th of 06. Because the emphasis had always been on the left knee. October 4th, 2006. November 14th, 2006. MRIs are taken of the low back and left shoulder. Epidural injections are provided to the low back and left shoulder. November 14th, 2006. This predates the bar fight by three months. December of 06, he continues to see Dr. Sherman for his low back and left shoulder. January 4th, 2006. Mr. Eigenbauer is rushed to the emergency room at Highland Park Hospital, January 4th, 2006, for pain to his left shoulder. Nothing else. I mean, he had other injuries, but it was the pain to the left shoulder that caused him to be rushed to the hospital on January 4th. And so any subsequent MRIs that may have occurred after the fight are simply a continuation of the procedures that he was being treated for. But there were MRIs before the fight that showed no tear. Well, it did indicate that there was an issue with his left shoulder and lower back. A tear is a tear. Well, but again, I don't believe that's true. Medically speaking, you have nothing in the record here. These are a bunch of medical reports, aren't they? You don't have live testimony here. No, we don't, but we do have the evidence. It's just medical reports. You don't have some doctor saying, well, look, he had an injury to his left shoulder, and with that severity of that type of injury, a tear could appear later. I mean, this is the type of testimony that would have been required. Your Honor, April 2, 2008, Dr. Sherman, Mr. Eigenbauer's treating physician, specifically noted that the injury sustained on April 22nd resulted in left knee pain, pain to both knees, the tear to the left shoulder, and it necessitated a spinal fusion surgery. Well, that was his conclusion. After having treated him, yes. But there's no medical testimony in here how he got to that conclusion, is there? But, again, if I may, Your Honor, there's no evidence. There's not one document showing that he sustained any injuries on February 7th. There's not one bit of evidence. Well, I thought that's when he was at the hospital and there was an MRI and there was a tear. No. When did the slap tear appear? Well, that appeared after the incident. No. What is the crucial date that it was physically observable as a tear? Was that February 7th? No, it was not. When did he have the MRI? There's an MRI that shows a tear. He had MRIs on the left shoulder. On what date that shows the actual tear that you could observe with the human eye? I believe it was October or November of 2006. Okay. That's definitely something that we'll have to check on. I thought it was on a different date. I'm sorry, Your Honor, if I may, but the evidence is replete that significant damage was done to the left shoulder. Epidural injections were provided prior to February of 2007. But I do have to go back to February 7th. There's not one bit of evidence that he sought nor that he received any medical treatment. In fact, he did not. He walked away from that fight. A fight occurred, and he walked away from it. And he never sought any treatment or received any treatment, none. He simply went home. It was on February 2nd. It was on February 2nd. Now, if I may, with this. Because this was a very large part of their initial brief. There was a mistake made by Dr. Anderson, a world-renowned spine specialist who Dr. Sherman referred Mr. Eigenbauer to. On February 2nd, before any fight, February 2nd, 2007, Dr. Sherman said that the treatment was not going the way it needed to go, and that because of the significant damage to his lower back, he had to see Dr. Anderson. Before he could see Dr. Anderson on February 2nd, the low back pain was so severe, he had to be rushed to Rush Hospital. This is where the little issue came up. All right. So you're saying that there was no MRI on February 15th, 2007, that showed this left? Well, there very well may have been. All right. Yeah, there very well may have been. And there were MRIs before that. And there, again, there's, we subpoenaed Rush Hospital for all, on June 27th, 2008, roughly a month before the hearing. We subpoenaed Rush Hospital and stated, give us all your medical records for Mr. Eigenbauer from January, February, and March of 2007. Now, again, if this bar fight would have led to, there would have been records in there indicating that. The only records that came back were from February 2nd. On February 7th, February 2nd, those documents were tendered to the board on July 8th, hand-person tendered to the board and are in the record. Now, again, on June 24th, roughly a month before the board hearing, Mr. Eigenbauer and his counsel noted that Dr. Anderson had made a mistake in one of his reports. He indicated that Mr. Eigenbauer had been rushed to Rush on February 7th. We immediately notified Dr. Anderson, and he did provide an updated, now this is another area where it was stated that the doctor that wrote the report did not provide a correction. That's completely false. On June 25th, we sent Dr. Anderson a letter stating if he could correct his record. I don't think Dr. Anderson's mistake is really a problem here. I think where the problem is is a very simple situation, which I'd like you to explain to us. There was an MRI taken of this shoulder, and it showed no tear. Then we have an incident on February 7th, and then we have an MRI on February 15th, the first time now showing a tear. The evidence shows that he had a problem with the shoulder right along. There's no question about that. But when we sit here in this court, we cannot substitute our judgment for that of the board. If I was the board, I might make a totally different decision as I do as an appellate justice, but because we have to deal with the manifest weight of the evidence. So what I'd like you to tell us is how can we relate this tear that they found on February 15th to the accident in question? Because he had been getting and receiving MRIs and being treated for the left shoulder pain throughout. He was treated for the pain, but there was no tear. There was no doctor who could testify that the tear would be a natural consequence of the injury that he had. There was nothing but medical records to deal with. You see, that's the problem. But there is a letter stating exactly what you would like. No, no, there's a conclusion by a doctor. We don't know what this doctor knew or didn't know or what records were given to him or what is the basis of his opinion. But there is a conclusion by a physician in the record that shows that it was related to his initial accident. I agree with you. There's a conclusion. But the question is this. It was the board who decided, you know, that it wasn't the duty disability. We have to look at the manifest weight of the evidence. See, that's the problem. And part of the issue before the board was the February 7th mistake. That's what was seized upon. This was nothing about objective evidence. The board's brief provides absolutely maybe two citations to the record to substantiate their belief. They pounced on a mistake by Dr. Anderson, who has a Swedish accent. They pounced on this. The board relied on any of the testimony of Mr. Eichenbauer. Didn't they consider what he said to the Office of Professional Affairs when he described his incident at the Helena's Tavern, how he had been thrown across the room, he was annihilated, he didn't know that he was being attacked, he didn't see it coming, and that he felt, you know, he said he flew on his left side. Isn't that the same side of the tear, the left side of the shoulder? Correct. Yeah. But again, he sought no medical treatment and he received no medical treatment. I understand that. But didn't the board in some ways consider all the evidence and part of it was this testimony regarding the incident? No. No? No. They substituted their hypothetical. They asked Dr. Demarest a series of hypothetical questions. Could this lead to a slap tear? All right. Well, then, on our review, do we look at the board's conclusions or do we look at what they had in front of them and determine whether that's supported by the,  Well, it's the record, what comprises the record. And manifest weight is described as if there's any competent evidence to support the board's conclusions, then the reviewing court, either the circuit court or the appellate court, has to affirm if it's supported by the manifest weight. But their initial argument was based on a mistake. That's upon which this case hinges. That's their initial argument in their brief that Dr. Anderson stated, Mr. Eisenbauer was rushed to the hospital on February 7th. That is what they pounced upon, and that was a major issue that they absolutely pounced upon. And there happened to be a fight that day. The only problem is there was absolutely no records of any treatment on June 7th. But there is treatment after that. Yes, and there's treatment after that as well and months before that. Well, isn't there a testimony in the record by the plaintiff himself as to what occurred on February 7th? Yes, absolutely. Yes, and he was clear. Yes, he did get attacked, but he was equally clear that he did not sustain any injuries and that there was no medical treatment sought. Now, whether or not he sustained injuries is a separate issue from whether or not he had sought treatment for them. I understand. Okay, but there's no record of that. What did he mean when he said, I got annihilated? Well, the guy attacked him. Yes. And then he Well, what do you normally mean when What can you infer? What can you infer as a board member sitting and listening to testimony from somebody who's been in a bar fight and he says, I got annihilated? Thrown across the room on his left side. Again, you can infer a variety of things. Okay. Would it be fair to infer that he may have suffered some sort of an injury as a result of being annihilated, quote, unquote, his words, in the bar fight? We can assume, but it's the record that dictates. But the MRI of February 15th shows a slap tear. The MRI in whatever it was, October, shows no tear. The whole issue of his duty disability is whether he can use this left hand. He's left-handed, isn't he? Yes, he is. I believe so. Honestly, I don't know if he is left-handed. I thought the disability related to his inability to be able to fire a weapon. No. No, because now he can't walk. No, he has a hard time walking. He's had surgery on both knees. He had a spinal fusion surgery. And, again, it cannot be overemphasized enough the incredible lack of citations the board has made. They make statements such as, it very well may have been. It possibly could have been. That's completely inappropriate. And Judge Riley, in his opinion, stated he would take the objective evidence presented by Mr. Eigenpower, Dr. Sherman, noting an injury to the left shoulder, October, November, being treated for that left shoulder before February 7th, Dr. Sherman's letter of April 2nd where he connects the dots. If the board has a problem with what he may have known. You could have argued that even if there was an incident on February 7th where he got annihilated, it was nothing more than an aggravation of a preexisting duty disability injury. I mean, that would be the most. To be fair to him. I mean, we looked at it that way. The board vote was 5-2. Yes, it was, in which one of the board members made clear that he had never seen an officer endure a character assassination like this. This is a man who has been with the police department for 23 years, has raised his right hand hundreds of thousands of times in different venues throughout Cook County, and he's always told the truth. And while his language could be inferred in a number of ways. There were seven board members who sat there and listened to him and listened to all of the medical staff. Yes. And you want us to substitute our judgment for them. No, we're simply trying to correct a mistake that was pounced upon. Do you understand the very steep hill you have to climb? Well, it's steep until you look at the record and see that, again, this case was an initial, they pounced on a mistake, and it allowed them to draw an inference. Judge Riley, quite a matter of factly, denied that wholeheartedly. There was not one bit of evidence. And Dr. Demarest stated that his opinions were purely hypothetical. And that's what the board is asking you to do, speculate. Do you want to sum up? Well, again, I would just say that there's no evidence, or if there is any, it's not enough to, it completely contradicts the manifest way to the evidence standard. There's been no objective evidence presented by the board, none. They pounced on a mistake that was clearly rectified. They refused to put it in the record, which was part of the underlying case. And we have records and reports from every doctor who looked at him, especially Dr. Sherman, who noted the link between the collision in April and the pain to the left shoulder. Thank you. Thank you, Mr. Sprague. Mr. Kugler, final word. Your Honor, I will not re-argue what I've already said in this case, but I would like to just address one issue. This statement that the board wouldn't put something into the record as if the board was hiding something, I take offense to that for this reason. First of all, Mr. Pereyka, when he was there, stipulated to the record before these proceedings started if something was missing at that time from the record, he could have addressed it. He did not. Secondly, when he filed his initial brief in this case, if something was missing from the record, he could have made a motion at that time to supplement something. He did not. When this particular document came up was in his reply brief when he first brought it to the attention. And it's very clear if you read the record in this case, if you read the record in this case, that that document was not available at the time of the board hearing because I specifically said to him, why are you giving me a report seeking to correct something from a doctor who didn't write it? If he had had the corrected letter, he would have said to me, Mr. Kugler, excuse me, here is the corrected letter. He did not have it then. Now, the issue in this case is really simple. As I look at it is this. No one disputes this man was injured. I'm not going to stand before this court and say he wasn't injured. The question is, what was the cause of the disability? And for counsel to say that there's nothing in the record to support the board's decision is not true because if you read the board's order, February 7, a bar fight. February 15, an MRI for the first time reveals a slap there. Never appearing before. If you look at Mr. Eigenbauer's initial statement to the board as his description of this accident and then look at what he was confronted with when the second statement was found that he had given about being annihilated and so forth, you would see how the board came to its finding that they did not find Mr. Eigenbauer credible. But the board had that letter as part of the record. Which letter? The letter correcting Governor Andrews. No, we didn't have it until he gave it to us in the reply brief. And if it was there before, it should have been presented before. Thank you. Mr. Kugler, Mr. Sprank, thank you both. The case will be taken under advisement. We stand adjourned.